23 C.C.P.A. (Patents)

## In re McCALLUM et al. *

### Patent Appeal No. 3496.

Court of Customs and Patent Appeals.
Dec. 2, 1935.

James A. Carr and Joseph J. Gravely, both of St. Louis, Mo. (R. Peale Herrick, of Washington, D. C., of counsel), for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner, of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellants filed their application in the United States Patent Office for a patent upon an alleged new and useful improvement in a process for treating pyrites. In connection with this application, 29 claims were filed, numbered from 1 to 29, inclusive. All claims were rejected by the Examiner. On appeal, the Board of

*Rehearing denied Jan. 27, 1936.

Appeals reversed the decision of the Examiner as to claims 20, 21, 22, 24, and 25, and affirmed the same as to the remaining claims. The appellants have appealed as to all claims rejected by said decision of affirmance.

Claims 3, 8, 13, 18, 26, and 29 are thought to be typical of all the rejected claims, and are as follows:

"3. The process which comprises burning pulverized pyrites in suspension in an atmosphere laden with oxygen, separating out the greater portion of the solid matter, and passing the gaseous matter with the remaining solid matter suspended therein into a reducing atmosphere kept at a temperature above the point of condensation of sulphur vapor, again separating out the solid matter and cooling the gaseous matter below the temperature at which sulphur vapor condenses."

"8. The process of producing flowers of sulphur from iron pyrites which consists in burning pulverized pyrites in a blast of air whose oxygen content is somewhat insufficient to oxidize all of such pyrites, subjecting the gaseous products of such burning with iron sulphide suspended therein but without free oxygen to a temperature in excess of the point of condensation of sulphur vapor, and drawing off and cooling the gaseous products to a temperature below that at which sulphur vapor condenses."

"13. The process which comprises burning pulverized pyrites in suspension in an atmosphere so adjusted as to temperature and oxygen as to promote the oxidation of the iron, and the reduction to elemental sulphur of the sulphur compounds, supplying steam or other form of water vapor to promote the more rapid oxidation of the iron and reduction of the sulphur compounds, settling or otherwise separating out the greater portion of the solid matter and conveying the sulphur vapors and gases into a condenser for the recovery of the elemental sulphur."

"18. The process which comprises burning pulverized pyrites in suspension within a suitable reaction chamber and generating therein by oxidation of the pyrites particles a porous catalytic agent which is autogenetic coincident with the burning of the pyrites."

"26. The process which comprises substantially auto-pyrogenetically treating pulverized sulphides in suspension in such a manner that the chemically basic constituents are convertible to and recoverable in an oxidized state, while the sulphur constituents are reducible to and recoverable in the form of elemental sulphur."

"29. The process which comprises burning sulphides in suspension in a reaction zone and maintaining within such zone an equilibrium of oxidation and reduction whereby the reduction of the sulphur compounds to elemental sulphur is promoted."

Appellants' alleged invention consists of a process for treating pyrites, and for the recovery of its constituent elements, chiefly having reference to the recovery of sulphur. In the process, iron pyrites ($FeS_2$) is first "finely divided." This finely divided substance is blown into the upper portion of a combustion chamber, in suspension in a current of air, by means of a blower. When the process is initiated, a series of burner jets surrounding the inlet to the combustion chamber is lighted, the fuel supply being any suitable substance, such as gas, powered coal, or powdered coke. The burning jets are utilized in the process until reaction starts within the combustion chamber, after which the jets are closed, the reaction supplying enough heat to complete the process. The appellants recite in their specification: "The quantity of oxygen is controlled so as to be somewhat less than that required for complete oxidation of the pyrites." As the air and pyrites enter the combustion chamber, decomposition is started. Some of the pyrites remains unchanged, some of it is changed to iron sulphide ($FeS$), a large portion is decomposed into other iron oxides, including ferrosoferric oxide ($Fe_3O_4$) and into sulphur dioxide ($SO_2$) and elemental sulphur ($S$).

From the combustion chamber, the current of gases and vapors enters a chamber called the reducing chamber, which is illustrated as a vertical chamber with funnel-shaped base and an endless belt arrangement passing the bottom orifice of the chamber to carry off such heavy oxides as are deposited out of the current.

It is claimed that the reaction in the combustion chamber is rapid and complete, and is catalytically accelerated by the ferrosoferric oxide produced in the operation. Some of this ferrosoferric oxide is carried over into the reducing chamber, and there continues its work as a catalyst. The temperature in this reducing chamber is kept above the point at which sulphur vapor condenses, that is, above 445

degrees centigrade. In this reducing chamber it is claimed that the remaining sulphur dioxide is deprived of its oxygen and that the elemental sulphur thereby produced, together with that previously produced in the combustion chamber, passes off in gaseous form into a suitable cooling and collecting chamber, where it is cooled and collected as flowers of sulphur. The iron compounds in the reducing chamber, after deoxidation of the sulphur, are deposited at the bottom of said chamber in the form of oxides. The specification then recites: "The iron compounds deposited in the combustion chamber contain some sulphur; and to eliminate this sulphur, such iron compounds, which are mostly various oxides of iron, are treated in a sintering machine and then reduced, as by smelting in a blast furnace or in an electric furnace." The sulphur which is obtained as a result of this sintering process is returned as a vapor from the sintering machine, and passes with the current of inflowing pyrites again into the combustion chamber.

In this process, it is stated by appellants in their specification that the process contemplates that the "draft will carry into the reducing chamber enough sulphides of iron to bring about reduction of the sulphur dioxide. This quantity may be controlled in the first instance by properly proportioning the quantity of pyrites in the charging blast with relation to the volume of oxygen in such blast; and a proper control can be readily ascertained by taking samples of the product at different points along the draft."

The specification also recites: "When using auxiliary fuel, such as oil, gas or powdered coke, a considerable quantity of water is produced by combustion. At other times it may be expedient to introduce water vapor either as steam or by other means."

The claims in issue here were rejected by both tribunals, on the following references: Benner et al., 1,751,066, March 18, 1930; Benner et al., 1,751,067, March 18, 1930.

Several features are urged by the appellants which, it is said, are novel and inventive in appellants' process and claims, and which it is claimed are not met by the Benner et al. references. To paraphrase these claims, they are, substantially, as follows:

First. That the Benner references do not disclose the feature stated in most of appellants' claims, that appellants use, in carrying the material into their apparatus, less air than is necessary for complete combustion of the pyrites.

Second. That the references do not disclose that the material subjected to the process must be so fine that it will be carried through the process in the air stream.

Third. That the reference patents do not show the production of ferrosoferric oxide during the early part of the process, and its consequent use as a catalyst.

Fourth. That the references show the use of fuel, while a novel feature of appellants' process is the production of sufficient heat to carry on the process, as the result of the reactions in the process.

Fifth. That the references do not show the production of a catalyst of an extremely porous character during the process described therein.

All of these features are claimed by appellants to be new and inventive.

It is noted that the Board of Appeals is apparently of the opinion that the Benner patentee did not appreciate the function which the ferrosoferric oxide performed in the Benner process. However, it is said by the board that the Benner patents show the production of ($Fe_3O_4$) during the process, and that whether its function was fully understood or not, it being concededly a catalyst and being shown to exist in the process, its effect would be the same whether understood or not. We agree with the Board of Appeals in its conclusion in this respect. That it was present in the Benner process is plainly shown by the specification in the reference patent 1,751,066, wherein it is stated: "The heat developed by the oxidation of the iron sulfide $Fe_3O_4$ serves to provide a large portion of the heat required to maintain the temperature of the reduction chamber, thereby reducing the use of the more expensive and less available coal and oil for heating purposes."

The reference patents to Benner were issued cotemporaneously on applications filed as of the same date. The only apparent difference between the two patents is in some details of construction which appear to be somewhat immaterial, so far

as the issues herein are concerned. The patents are concerned with the extraction of elemental sulphur from sulphide ores, particularly pyrites or pyrrhotite. In the patents, the sulphide ore is introduced into a reduction chamber through an opening in the top. The reduction chamber is a vertical chamber, much deeper than its width, having a funnel-shaped bottom which empties into a receptacle for the collection of solid matters. With the sulphide ore, which is "in the granular state either coarse or finely divided," carbonaceous fuel, equal to 10 per cent. or more of the total charge, is dropped through the top opening or feeding device. The proportion of carbonaceous fuel may be varied according to the necessities. At the bottom of the reduction chamber is an inlet through which an oxidizing gas, including a portion of free oxygen, is admitted. In the process, where the charge is in a state of coarse division, the chamber is practically filled with the charge. However, where the charge is finely divided, suitable means are "provided for dispersing the same such as a rotating cone or a blast of a gaseous medium." It results that in such cases of fine division the falling material in the reduction chamber is met by the rising blast from the inlet pipe, and is thus dispersed and carried forward in the process. The reduction chamber is maintained at a high temperature of from 700 to 800 degrees centigrade, or above. This chamber consists of three portions, A, B, and C. In the top of the chamber, in zone A, according to the specification in patent 1,751,066, a reducing atmosphere is maintained and a large part of the volatile matter in the fuel is driven off. The sulphide ore also decomposes, yielding free sulphur (SO), and some iron oxides, such as ($Fe_3O_4$). In zone B, if coal is used as a fuel, coke is produced and is substantially utilized in the reduction of the sulphur dioxide and carbon dioxide ascending from the zone below. Gases containing sulphur dioxide may be also introduced into the reduction chamber at the bottom of zone B. In the bottom zone of the reduction chamber, the unoxidized iron sulphide descending from zone B is burned completely, yielding sulphur dioxide and iron oxide. Various other chemical reactions occur which are unnecessary here to further specify. The statement is made in this specification: "The amount of air admitted through the inlet 3 is regulated so that any excess oxygen over that required to oxidize the FeS and carbon is avoided."

The gaseous products of the reduction chamber are removed through the top thereof, through an outlet, while the ash and cinder content may be removed from the bottom of the chamber by suitable means. It is stated: "By a proper regulation of the air, sulphur dioxide, coal and sulfide ore, admitted to the chamber, it is possible to provide for complete oxidation of the coal and ore, maintain the required temperature for the reduction, and reduce substantially all the sulphur dioxide gas to elemental sulphur."

The ash and cinder product may be discharged from the bottom of the chamber as a nonsintered product by any well-known means. The specification then discloses that the gas mixture from the reduction chamber is carried through a conduit to a catalyst chamber, where a suitable catalyst is provided to aid in the reduction of these gases in order to yield elemental sulphur. There is a device provided to remove such material as soot or other solid carbonaceous material before the gaseous mixture enters the catalyst chamber. The temperature of the catalyst chamber is maintained at about 350 degrees centigrade to prevent the condensation of the sulphur vapor and to provide for rapid interaction of the gases. The sulphur vapor and gases are then removed from the catalyst chamber, and the sulphur vapor is condensed by any suitable apparatus for heat interchanging.

It seems quite evident from our résumé of the Benner patents that the first suggestion of the appellants, namely, that the application here shows, for the first time, that less air is used than is necessary for complete combustion, was disclosed in the Benner patents. Repeatedly the inventor calls attention, if not in direct words, by implication, at least, to the fact that the amount of air to be admitted to the chamber is limited. Evidently the amount can be and is regulated from time to time, in order to expedite the process and to get the most satisfactory results. It will be noted that the appellants here do not specify any particular amount of air except that it must be less than the amount required for complete combustion. We think the patents referred to disclose sufficiently this feature.

Next it is contended that the appellants here have described a process where the

pyrites are pulverized, and fine enough to be carried along in the air stream, and that this is not met by the references. Benner shows the use of material in a coarse state, or in a finely pulverized state; in other words, has disclosed the use of the material in all forms. It is quite obvious that if the material be in a finely pulverized state, the blast of oxidizing material from the base of the Benner reduction chamber will carry this finely divided matter along with the stream of oxidizing material. As a matter of fact, it is plain that such material must be carried from the reduction chamber to the catalyst chamber and, thence, out of the apparatus, because of the flow of such heated material from one chamber to the other. Thus, we think it may be fairly said that the Benner device shows a "carrying along" of the material in the stream of gases during the process.

As to the use of the ferrosoferric oxide as a catalyst, it is plain that this material, being produced during the early stages of the Benner process, will act as a catalyst whether the patentee understood its exact function or not. Therefore, it was disclosed, and the appellants can claim no patentable feature in that respect. The mere discovery of the function of this catalyst does not connote patentability. In re Treuting, 76 F.(2d) 310, 22 C.C.P.A. (Patents) 1095.

It is also said that the Benner patents disclosed the use of fuel, while the appellants dispense with fuel, thus making a much more economical process. Appellants, however, do use fuel in one stage of their process, and do show, as we have heretofore quoted, that the use of fuel is possible, and recommended under some circumstances. In this respect, therefore, the appellants do not distinguish from the Benner process.

Contention is then made that the particular character of the process of the appellants produces a porous catalyst, which is much more satisfactory in its application than that of other catalysts. The porous nature of this catalyst is said to arise from the fact that in the early stages of appellants' process, the reduction of the sulphide ores is almost explosive in its character. No reason, however, has been shown in the record here, so far as we have observed, why the Benner process will not operate in the same way and produce ferrosoferric oxide of the same porous character. The conditions being the same, it would seem to naturally result that such would be the case. Therefore, we are unable to see wherein the process of appellants is inventive over the reference patents, in this respect.

The claims are many, and differ somewhat in verbiage. However, the points which are here alluded to are the ones which it is said distinguish appellants' application from the reference patents. As we have found that in the respects complained of there seems to be nothing inventive over the references, a more particular discussion of these disallowed claims is thought to be unnecessary. Therefore, the decision of the Board of Appeals should be, and is, affirmed.

Affirmed.